UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y,

★ NOV 1 7 2011 ★

LONG ISLAND OFFICE

--------------------------------------------------------X

ANTHONY VILLAFANE,

                    Petitioner,

                                              **OPINION & ORDER**
                                              **CV-09-5545 (SJF)**

-against-


DALE ARTUS,

                    Respondent.
-------------------------------------------------------- X

FEUERSTEIN, J.

On December 15, 2004, a judgment of conviction was entered against petitioner Anthony Villafane ("petitioner") in the County Court of the State of New York, Suffolk County (Ohlig, J.), upon a jury verdict finding him guilty of murder in the first degree and murder in the second degree and imposition of sentence. By order dated February 19, 2008, the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("the Appellate Division") modified the judgment by vacating the conviction of murder in the second degree and the sentence imposed thereon and dismissing that count of the indictment, but otherwise affirmed the judgment. On December 7, 2009, petitioner filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner now seeks, *inter alia*, the appointment of counsel and to stay this proceeding pending exhaustion of his claims in state court. For the reasons set forth herein, petitioner's applications are denied and the petition is denied in its entirety.

1

## I. BACKGROUND

### A. Factual Background

#### 1. Voir Dire

During voir dire, the trial court asked prospective jurors, *inter alia*, if they, or anyone close to them, worked for any law enforcement agency, (V. 56-57, 300, 401, 415, 437, 544, 545, 548, 671), and defense counsel further questioned the prospective jurors, *inter alia*, about their opinions about police officers and, specifically, whether they believe that police officers are more credible or trustworthy than other people and/or are capable of abuse (V. 146-51, 250, 267, 345-47, 351-53, 505-08, 608-610, 712-14). Of the six (6) prospective jurors from the first panel who indicated that they had relatives in law enforcement, (V. 57-60, 94, 107), one (1) was excused for cause without opposition, (V. 154), and defense counsel exercised two (2) peremptory challenges to excuse two (2) others, (V. 157). Accordingly, three (3) prospective jurors from the first panel who had relatives in law enforcement were empaneled as jurors. However, all of those prospective jurors indicated that their ability to be fair and impartial would not be affected by their association with people in law enforcement. (V. 57-60, 94).

Of the twelve (12) prospective jurors from the second panel who indicated that they had relatives or close friends in law enforcement, (V. 187-89, 202, 212-16, 226, 232, 234-36, 244-45, 250-59, 273-78, 280), three (3) were excused for cause without opposition, (V. 282-83, 286-87); the prosecutor exercised peremptory challenges to remove three (3) other prospective jurors, (V. 283, 288-89); and defense counsel exercised peremptory challenges to remove four (4) other prospective jurors, (V. 283). The trial court denied defense counsel's request to remove for cause prospective juror fifteen ("PJ 15"), who had indicated that her son is a corrections officer,

2

that all of her sons-in-law and male relatives are retired police officers and that the females in her daughter-in-law's family are corrections officers in the Suffolk County jail, (V. 202, 275-76), but who ultimately indicated that she could be fair, (V. 278). Defense counsel did not exercise a peremptory challenge to remove PJ 15. (V. 290-91). Accordingly, two (2) prospective jurors from the second panel who had an association with those in law enforcement were empaneled as jurors. (V. 283-89).

Of the five (5) prospective jurors from the third panel who indicated that they, or someone close to them, worked for a law enforcement agency, (V. 300-05, 345-47, 351-53), two (2) were removed for cause on consent, (V. 370-71); defense counsel exercised one (1) peremptory challenge to remove another prospective juror, (V. 369); and the prosecutor exercised two (2) peremptory challenges to remove the remaining two (2). (T. 371).

Of the five (5) prospective jurors from the fourth panel who indicated that they, or someone close to them, worked for a law enforcement agency, (V. 401-09), four (4) were removed for cause on consent, (V. 401-06); and defense counsel exercised one (1) peremptory challenge to remove the remaining one, (V. 515).

Of the four (4) prospective jurors from the fourth panel who indicated that they, or someone close to them, worked for a law enforcement agency, (V. 544-45, 548-49, 610-11), one (1) was removed for cause on consent, (V. 545); the prosecutor exercised one (1) peremptory challenge to remove another. (V. 633); and a full jury, including alternates, was selected before consideration of the remaining two (2) prospective jurors. (V. 635). Accordingly, five (5) of the initial jurors empaneled had associations with law enforcement.

Prior to the start of the trial, two (2) jurors, including one (1) of the jurors who had an

association with law enforcement, were excused. (V. 640, 734-35). In addition, defense counsel informed the trial court that he did not believe that PJ 15 was a suitable juror because some corrections officers and inmates at the Suffolk County Jail had learned that she is the mother of at least one of the corrections officers who work at the jail. (V. 645). According to defense counsel, although he knew that PJ 15 had sons in law enforcement, he believed she was a suitable juror "in light of the manner that she answered her questions, the manner that she * * * was listening very carefully to the whole process." (V. 646). However, once he learned that officers and inmates at the jail had become aware that PJ 15 was the mother of at least one of the corrections officers, he realized that she "had to have mentioned th[e] case to one or both of her son's [sic]." (V. 646). Defense counsel argued that petitioner was prejudiced thereby because PJ 15, thus, knew that petitioner was in custody and potentially knew that petitioner's co-defendant would be testifying against him and that petitioner was charged under a different indictment with conspiracy to kill that co-defendant. (V. 647-48). The trial court agreed to question PJ 15 "to a limited degree" to determine whether she was grossly unqualified to serve as a juror. (V. 651-52).

Prior to questioning PJ 15, the trial court conducted further voir dire proceedings to select two additional alternate jurors to replace the jurors who had been excused. Of the four (4) prospective jurors who indicated that they had associations with law enforcement, (V. 671-74, 684, 697-98, 712-14), one (1) was discharged for cause without opposition, (V. 722-23), and defense counsel exercised a peremptory challenge to remove another one, (V. 723). Prospective juror number six, who had indicated that her ex-boyfriend was a police officer, but that she would not hold that against the prosecution, was empaneled as alternate juror number five, (V.

4

724-25), and the alternate jurors were empaneled prior to consideration of the remaining prospective juror, (V. 724-25).

The following then ensued with respect to PJ 15:

> COURT: * * *[O]ther than informing your family or anyone else that you were sitting on a murder trial in Riverhead in the case of People versus Villafane, have you had any other discussions with any member of your family or anyone else relative to this case other than just saying that?

> [PJ 15]: I told them that I would be on a murder trial, yes, I did.

> COURT: That was it?

> [PJ 15]: That was it.

> COURT: You didn't go any further, you didn't ask any questions of them for any input?

> [PJ 15]: No.

> COURT: You didn't ask them any questions?

> [PJ 15]: No.

> COURT: So you did follow the Court's instructions?

> [PJ 15]: Although my son did express surprise.

> COURT: He expressed surprise?

> [PJ 15]: Because I baby-sit his child, and when I told him why I could not and I told him I was going to be on this trial, he was surprised.

> COURT: Okay. So you told him that you were on the case?

> [PJ 15]: Yes.

> COURT: Okay. And you followed my instructions then when I told all the jurors when you leave here if anybody asks you if you're on a trial, you've been selected, you say that you're on a murder trial, Judge Ohlig's part on the third floor in the County Court, Criminal Court Building, is that right?

5

[PJ 15]: Well, I didn't actually, I didn't tell them your name and I didn't tell them where the court was, obviously people will see I was probably new.

\* \* \*

[DEFENSE COUNSEL]: \* \* \* Now, ma'am, when you told your son of which you baby-sit his child, did he ask you any questions regarding the facts of this case?

[PJ 15]: No, he did not. And I did not tell him.

[DEFENSE COUNSEL]: Now, you're other son is a correctional officer, am I correct?

[PJ 15]: No, my other son is not. My son-in-law was a C.O. here, he is now a fireman. My other son-in-law is a detective with Special Victims Crimes in Fairfax, Virginia.

[DEFENSE COUNSEL]: \* \* \* Did you have any conversations with him or did you tell him anything about this case at all?

[PJ 15]: No.

\* \* \*

[DEFENSE COUNSEL]: \* \* \* [D]uring the pendency of this trial, do you think that it would be a problem for you not to discuss the facts of this case with any of your family members?

[PJ 15]: No. I don't think that would be a problem.

[DEFENSE COUNSEL]: Okay. And you would uphold the instructions of the Court not to divulge any facts or circumstances of this case with anyone else?

[PJ 15]: No, I think I would have no problem.

\* \* \*

COURT: All right. I'm satisfied that [PJ 15] has followed the directions of the Court. She's been very truthful and direct once again today as she was on the day during the course of jury selection. [PJ 15] is going to remain as juror number seven. Let's just get this clear. You only have one son who is in the Sheriff's Department now, is that right?

6

[PJ 15]: That's correct.

COURT: Okay.

[PJ 15]: But my daughter-in-laws [sic] are all CO's also, which I did tell you.

COURT: You haven't discussed anything with them either?

[PJ 15]: No, I have not.

* * *

COURT: I'm satisfied that she can remain and continue as a juror here, reassuring the Court here that she has not discussed the case with anyone and nobody has discussed the case with her and she will remain as juror number seven. * * *

(V. 738-43). Defense counsel objected to the trial court's ruling. (V. 743).

### 2. The People's Case

Prior to the start of the trial, the prosecutor informed the court that one of its witnesses, Jesse McLaurin ("McLaurin"), was a registered confidential informant with the Suffolk County Police Department ("SCPD") since November 2002 and that there had been no promises with respect to the charges pending against McLaurin in exchange for his testimony at trial. (T. 3-4).

### a. The Burglary Plan

Jorge Branas ("Branas") testified that in June 2003, he lived in Bellport, New York and knew petitioner, whom he identified in court, for eight (8) or nine (9) years. (T. 298, 299). According to Branas, petitioner is the father of his sister's son. (T. 299-300).

Branas testified that on Saturday, June 7, 2003, petitioner asked him to participate in a burglary at 40 Cedar Avenue in Medford, New York ("the Medford house" or "the house") that

he had discussed with Johnny Booker ("Booker"), a/k/a "Boo," a man who lived in Bellport. (T. 560-61, 574-76). According to Branas, he had been friends with Booker since elementary school and knew him to be a drug dealer. (T. 302, 514-16). Petitioner also knew Booker "for a long time." (T. 574). Branas testified that petitioner told him that there were two (2) "white boy" drug dealers who had fifteen (15) pounds of "weed," i.e., marijuana, and nine thousand dollars ($9,000.00) in a safe in the Medford house and that he wanted Branas "to watch his back" during the burglary. (T. 302-03, 576, 578). According to Branas, Booker did not want to participate in the burglary because he either bought or sold drugs from a person in the Medford house and he did not want to "burn [his] bridges." (T. 519-20). Branas testified that he tried to dissuade petitioner from participating in the burglary, but petitioner told him he was "desperate" and needed the money. (T. 303-04, 511).

Jesse Antwon McLaurin ("McLaurin") testified that he knew petitioner, whom he identified in court, since the 1990's. (T. 719-20). According to McLaurin, on June 10, 2003, at approximately 6:00 p.m., he received a call from petitioner on one of his cellular telephones, which had been assigned telephone number (516) 906-2818 ("McLaurin's cell phone")[1], during which they agreed to meet at a gas station in Bellport. (T. 720-22). Crystalee Danko ("Danko"), the custodian of records for Sprint Telecommunications, (T. 196), testified that telephone records for cellular telephone number (631) 764-0511, for which Lauro Barzallo ("Barzallo") was the subscriber ("the Barzallo phone")[2], (T. 199, 206), indicate that on June 10, 2003, between

---

[1] McLaurin testified that he also had a cellular telephone assigned telephone number (631) 987-4994 at that time. (T. 721).

[2] McLaurin later testified that the calls he received from petitioner came from the Barzallo phone. (T. 747-48).

approximately 6:17 p.m. and 6:25 p.m., three (3) telephone calls were made from the Barzallo phone to McLaurin's cell phone, and that at 8:05 p.m. that same date an additional call was made from the Barzallo phone to McLaurin's cell phone. (T. 201-04).

McLaurin testified that when he met petitioner at the gas station in Bellport, petitioner asked him if he had a "burner," or handgun, for a robbery he had lined up. (T. 723-24). According to McLaurin, petitioner explained to him that he intended to wear a full-face ski mask, go to the place he was going to rob with a gun, "lay somebody down" by placing the gun to their head and then ask them where the safe was. (T. 724, 774, 779). McLaurin told petitioner that he did not have a handgun, (T. 724, 798), but that if he came across any jewelry during the robbery, he could call McLaurin and McLaurin would "take it off his hands." (T. 725, 780-82).

Branas testified that on Tuesday, June 10, 2003, at his and petitioner's request, his sister, Carida Alverado ("Carida"), bought them two (2) pairs of gloves at a 7-Eleven store. (T. 306). According to Branas, he wanted the gloves so that he and petitioner could commit the robbery. (T. 306-07).

Branas testified that later in the evening on June 10, 2003, he was smoking marijuana at his house when petitioner came to the window and asked him if he was ready to "go make the burglary." (T. 304-05, 492-95). When Branas indicated that he was ready, petitioner grabbed Branas's sister's cell phone and called Booker to tell him that they were going to his house. (T. 305, 517-18). Branas denied ever using his sister's cell phone to call Booker himself. (T. 517). At that time, Branas had been wearing a blue sweater with a white sweater over it, a black do-rag and the white gloves with black dots that Carida had bought them earlier in the day. (T. 309-10). Petitioner also gave Branas a red bandana to cover his face. (T. 314-15, 446-47). According to

9

Branas, petitioner had been wearing a black sweater, black ski mask and the same white gloves with black dots that Carida had bought them. (T. 310, 314).

At approximately 9:30 or 10:00 p.m. that same night, Carida drove Branas and petitioner to Booker's house in Bellport. (T. 310-11, 524). Branas testified that at some point that night, he, petitioner, Booker and Booker's friend or cousin, whose name Branas did not know, then left Booker's house and got into an old, brown four (4)-door car to drive to the house in Medford that they intended to burglarize. (T. 312, 522-25). Before driving away, Booker borrowed petitioner's gloves, got out of the car and returned approximately two (2) minutes later with a loaded nine millimeter gun. (T. 313). Booker returned one of the gloves to petitioner and then handed petitioner the gun with the other glove. (T. 313-14). Petitioner placed the gun in his front waistband. (T. 313-14). According to Branas, they then drove away "to do the house," with Booker's friend driving. (T. 313-14).

Branas testified that when they arrived at the Medford house, Booker said "well, do what you got to do," to which petitioner responded "no doubt" and smiled. (T. 316-17). Petitioner then got out of the car, went through the woods to check out the house and returned to the car. (T. 317). A car then drove into the driveway of the Medford house and they saw a man enter the house alone, so they waited. (T. 317-18). Once petitioner and Branas got out of the car, Booker and his friend left. (T. 317). Branas and petitioner then walked through the woods to the back of the house to see if it was secure and to check the shed. (T. 317-20). As petitioner and Branas came out of the backyard, a car passed them so they started walking to the corner with their masks in their pockets. (T. 321). Branas testified that when they reached the corner, he again tried to dissuade petitioner from committing the burglary, but petitioner told him not to worry

10

and asked him to watch his back. (T. 321-22).

b. The Burglary

In June 2003, Adam Galasso ("Galasso") rented and lived in the Medford house with Michael Berman ("Berman"), whom he had known for at least fifteen (15) years. (Galasso: T. 805-06, 858; Stump: T. 981-82, 1022-23). At that time, Berman had been dating Heather Stump ("Stump"), who stayed at the house on the weekends. (Galasso: T. 806; Stump: T. 981, 1022, 1028).

Stump testified that on June 10, 2003, she and Berman had gone out and returned to the house around 10:30 p.m., at which time they changed into pajamas and went to sleep around 11:00 p.m. (T. 985-87). Galasso testified that on June 10, 2003, he worked until 11:00 p.m. and returned to the house at approximately 11:20 p.m. (T. 807, 860). At that time, Berman was sleeping in his room with Stump. (Galasso: T. 812; Stump: T. 1029). Galasso eventually laid down on his bed to do some paperwork, leaving the light behind his bed on. (Galasso: T. 808-09, 814, 825, 860-61). According to Galasso, he had jewelry and one thousand five hundred dollars ($1,500.00) from his tax return check in a safe in his closet at that time. (T. 815, 869-71). In addition, he had approximately four hundred dollars ($400.00) in dollar bills wrapped in red rubber bands in a shoe box in his room, which he was saving to pay for a vacation. (T. 854-57, 868-69, 872-73). Galasso denied possessing any drugs or a large sum of money in the house or dealing drugs at that time. (T. 816, 854, 870).

Branas and petitioner entered the Medford house through the unlocked front door sometime after 11:00 p.m. (Branas: T. 322, 325). As Galasso was lying in his bed doing

11

paperwork, he heard a "click," at which time he looked up and saw a man holding a gun in his right hand standing in the doorway of his room. (Galasso: T. 817-18, 825, 861-62). Galasso identified the man as being white, in his twenties, approximately five feet eight inches (5' 8") or five feet nine inches (5' 9") tall, of medium build and wearing a black ski mask, black sweater with long sleeves and black leather gloves. (T. 817-19, 828, 852, 867). According to Galasso, although the man was wearing a ski mask, he could see the color of his skin through the eye holes in the mask. (T. 818).

Galasso testified that the man in the doorway pointed the gun at his head and chest area and told him to turn around and put his hands behind his back, so he did. (T. 819-20, 853). He was then lying on his stomach with his hands behind his back. (T. 819). When the man saw Galasso looking at him in the mirror above the headboard, he placed a pillow from the bed over Galasso's head, grabbed a gold chain with a gold cross off of his neck and pointed the gun at his back. (T. 820-24). According to Galasso, the man then asked him where the twenty (20) pounds of weed was, to which Galasso responded that he did not know what the man was talking about. (T. 820, 853). The man then asked him how many other people were in the house and Galasso told him that there were two (2) other occupants in the other bedroom. (T. 820, 853).

Branas testified that he followed petitioner through the house and into a bedroom ("Galasso's bedroom"), where he saw petitioner, who was wearing the ski mask, holding a gun to the back of the head of a guy lying face down on a bed. (T. 327-29). A light on a dresser was on. (T. 329). Branas observed that petitioner had two (2) gold chains wrapped around his hand, which he then put into his pocket. (T. 330). Petitioner motioned for Branas to look around the rest of the house to see if there was anybody else around. (T. 331). When Branas looked in the

12

next bedroom ("Berman's bedroom"), he saw two (2) people, a male and a female, sleeping in a bed. (T. 331-32).

Galasso testified that after the man with the gun had grabbed his necklace, he told Galasso to get up. (T. 825, 853). When Galasso stood up, the man pointed the gun toward his back and told him to go to Berman's bedroom. (T. 825, 853). As they walked by a mirror on a dresser, Galasso caught another glimpse of the gunman, who was directly behind him, and observed that the bridge of his nose was about even with the top of Galasso's head. (T. 826-28). Galasso is five feet seven inches (5' 7") tall. (T. 828).

Petitioner brought Galasso into Berman's bedroom and had him turn on the light. (Branas: T. 333, 341, 480-81; Galasso: T. 828, 853, 862). Stump testified that she awakened when she heard yelling, then she heard someone say "get the fuck up. Get on the floor." (T. 986-87). According to Stump, the lights were on and she observed two (2) people with their faces covered, one by a red paisley bandana and the other by a full ski mask, standing over her bed and a gun being pointed at her by the person wearing the ski mask. (T. 986-89, 1009-10, 1016-17, 1037). At gunpoint, petitioner ordered all three (3) people to get down on the floor and demanded to know where the safe, money and weed were located. (Branas: T. 334-35, 481; Galasso: T. 828-29, 831-34, 837-38, 853, 862, 871-72; Stump: T. 989, 994-95). Branas testified that Berman responded that he only had fifty dollars ($50.00) on the dresser. (T. 337, 339, 342). Stump testified that all three (3) of the victims denied knowing anything about drugs and that Berman told the burglars about the shoe box in Galasso's room containing some money. (T. 995-96). According to Branas, he grabbed the fifty dollars ($50.00) from the dresser in Berman's bedroom, then he searched Berman's bedroom while petitioner kept the gun pointed at the

13

victims. (Branas: T. 337, 338, 342). Galasso testified that when he heard "shuffling" in Berman's bedroom, he looked up from the ground and saw a second man standing in the doorway with the gunman. (T. 835-36). Galasso described the second man as thin, approximately five feet five inches (5' 5") tall and wearing a white long sleeve shirt, a red bandana around his face up to his nose, white gloves with black speckles and "something dark on the top of his head." (T. 836-37, 852-53).

Branas testified that he left Berman's bedroom and returned to Galasso's bedroom to look for money, where he found a box of single dollar bills packaged with two (2) rubber bands. (T. 343-45). According to Branas, he placed the box on the bed and yelled "Bingo." (T. 345-46, 471). Galasso testified that while the gunman remained in Berman's bedroom, he heard "shuffling" coming from the direction of his bedroom, then he heard the word "jackpot." (T. 838-39). Petitioner then walked into Galasso's bedroom to see what Branas had found, dragging Stump with a gun to her back and then forcing her to lie down on the floor. (Branas: T. 346-477, 471-72; Stump: T. 995-1000, 1031). According to Branas, petitioner left Stump on the floor while Branas showed him the money. (T. 348). Petitioner then left Galasso's bedroom, following which Branas found a second box containing loose single dollar bills. (T. 348, 472). As Branas turned around, Stump got up and ran down the hall. (Branas: T. 348, 472; Stump: T. 1001, 1031). Galasso observed Stump running down the hallway. (T. 839, 842, 863-64). Branas ran after Stump, pushed her, grabbed her by her hair and pulled her back down the hallway. (Branas: T. 350, 472-73; Stump: T. 1001-03). According to Branas, petitioner was standing in the hallway pointing the gun into Berman's bedroom where Berman and Galasso remained lying on the ground. (T. 351, 352). When Branas brought Stump back to Berman's bedroom,

14

petitioner punched her in the right eye with his left hand and she fell down at the edge of the doorway into Berman's bedroom. (Branas: T. 351-53, 356, 473, 478-79; Galasso: T. 839-40, 843, 845, 864; Stump: T. 1003, 1005-07, 1032). Galasso did not recall whether petitioner had hit Stump with the gun or not, (T. 839-40), and Stump did not know with what she had been hit. (T. 1003). Stump testified that as a result of being hit, her right eye was injured and a lower tooth on her right side was chipped. (T. 1004). Stump further testified that she was also kicked when she was on the ground. (T. 1006, 1032-33).

Branas testified that he then got nervous and ran into Galasso's bedroom where he grabbed the money and placed it all into one box. (T. 354-55, 473-75). Galasso testified that after Stump fell to the ground, petitioner walked over to Berman and said "why you holding out on me," then punched Berman in the back of the head twice. (T. 843-44, 853, 865). Petitioner then did the same to Galasso. (T. 843-44, 853, 865). The gunman then went back to the hallway. (T. 845, 865). Galasso testified that he then heard "a lot of commotion," following which he saw Berman stand up. (T. 845, 864-66). Branas testified that he also saw Berman stand up, then he saw petitioner walk straight toward Berman pointing the gun at him. (T. 355, 357, 359). On cross-examination, Branas testified that he did not see Berman "jump[] up" or "lurch[]" at petitioner. (T. 476-78). According to Galasso, after Berman stood up, he also stood up. (T. 845, 866). Branas, Galasso and Stump all testified that they next heard two (2) shots. (Branas: T. 355, 357, 475-76, 477; Galasso: T. 845-46, 865-67, 874-75; Stump: T. 1006-07, 1033). Branas testified that petitioner "shot the guy in his chest, two holes." (T. 355-56, 358, 359, 475-76, 593). Galasso testified that he did not see the second man wearing the red bandana near the gunman nor the gun at the time the shots were fired. (T. 846). On cross-examination, Galasso

15

testified that he did not see Berman get shot. (T. 866-67, 880). On redirect examination, Galasso testified that only two (2) or three (3) seconds passed from the time that he heard the shots until he next saw the gunman pointing a gun toward Berman in Berman's bedroom. (T. 875-76). On re-cross examination, Galasso was questioned about his grand jury testimony, in which he stated that "there was a commotion. [He] could not see at that point. [Berman] got up to intervene and there was an accident. He was shot twice or three times in the chest." (T. 877-78). On further redirect examination, Galasso denied that the shooting was an accident and stated that he "believe[d] the word [he] was looking for was 'incident' maybe." (T. 878-80).

After the shots were fired, Berman grabbed his chest and fell to the ground. (Branas: T. 359; Galasso: T. 846; Stump: T. 1007-09). Branas testified that after he heard the shots, he ran out of Galasso's room holding the box of money and petitioner followed him. (T. 359-60). Galasso testified that after he heard the shots, he got back down on the ground. (T. 845, 866). When Galasso looked up, he saw the gunman in the hallway fleeing. (T. 846). Galasso paused for "a second or two," then he ran outside to see if he could see "any cars or anything," but he did not see anything. (T. 846-47). Galasso testified that when he heard Stump screaming, he ran back inside and called 911. (T. 847). Stump testified that she had called 911. (T. 1013).

Branas testified that upon leaving the house, he ran down Old Medford Avenue with petitioner behind him toward the street where Booker and his friend had prearranged to meet them. (T. 360-63). Booker and his friend were not at the prearranged location when Branas and petitioner arrived so Branas panicked, took off his clothes and threw them down a storm drain. (T. 363-64, 556). Petitioner also took off his clothes and Branas threw them down the same storm drain. (T. 364-65). They then ran south and petitioner dropped the gun at the corner of a

16

house at the end of Mount Vernon Avenue. (T. 367-70). Branas testified that he also threw the shoebox away as they ran. (T. 438, 451).

Branas and petitioner met up with Booker and his friend in a Meat Farms parking lot and they went back to Branas's house in Bellport. (Branas: T. 372, 564). Branas and petitioner counted the money, which totaled six hundred dollars ($600.00), which they then split. (T. 373). Branas and petitioner also discussed getting rid of the two (2) gold chains, two (2) crosses and a ring they had taken from the Medford house the next morning. (Branas: T. 373, 377). Branas testified that petitioner had ripped a gold chain with a diamond cross off of the male victim in the first bedroom, (T, 374-77), and that he had taken the ring, (T. 375), which, according to Galasso, had been on his nightstand. (T. 822).

Branas testified that on the morning after the robbery, petitioner told Branas that he was going to give the jewelry to "his drug dealer" in Medford. (T. 378-79). Petitioner then called the "drug dealer" from Carida's cell phone and told Branas that "the drug dealer" would be coming to Branas's house to look at the chains. (T. 378-80). McLaurin testified that at approximately noon on June 11, 2003, petitioner called him on his cell phone and told him that he wanted to meet because he had something for him. (T. 728-29, 780). Danko testified that the Sprint telephone records for the Barzallo phone indicate that on June 11, 2003, between approximately 12:08 p.m. and 1:17 p.m., four (4) calls were made from the Barzallo phone to McLaurin's cell phone, and that at 12:58 p.m. that same date, the Barzallo phone received a call from McLaurin's other cell phone number, (631) 987-4994. (T. 201-05).

McLaurin testified that at some time in the morning of June 11, 2003, he learned that someone had been killed during a home invasion in Medford. (T. 744-45). Later that day,

17

McLaurin met petitioner in Bellport, at which time petitioner told him that he had some jewelry for him which he had gotten the previous night. (T. 729-31, 798-99). According to McLaurin, they discussed a price for the jewelry and petitioner told him that "a girl" had appraised it for one thousand five hundred dollars ($1,500.00), but McLaurin told him that the price was too high. (T. 731-32). Petitioner told McLaurin that he needed to discuss a price with Branas, because he had been involved in getting it, and he would call McLaurin later. (T. 732). McLaurin then left. (T. 732). A short time later, petitioner again called McLaurin on his cell phone and discussed a price of one thousand two hundred dollars ($1,200.00), but McLaurin told him that the price was still too high. (T. 733). McLaurin then returned to Branas's house and they eventually agreed upon a price of seven hundred dollars ($700.00). (T. 734-35). McLaurin took the jewelry, (Branas: T. 381, 386; McLaurin: T. 735-36, 783), and agreed to meet petitioner and Branas where he lived to give them the money. (Branas: T. 386; McLaurin: T. 736).

During Branas's testimony, the prosecutor asked Branas: "When he [McLaurin] was there, did you discuss a price for this jewelry?" (T. 381). Branas responded that the "drug dealer" told them that he would give them seven hundred dollars ($700.00) and fourteen (14) grams of cocaine for it. (T. 381). Defense counsel objected to Branas's response and a sidebar discussion was held outside of the hearing of the jurors, during which defense counsel contended that petitioner was prejudiced by the admission of uncharged drug possession and/or drug sale evidence. (T. 381-85). The trial court overruled the objection and defense counsel moved for a mistrial. (T. 384). The trial court denied the motion for a mistrial, to which defense counsel objected. (T. 385).

When Branas and petitioner met McLaurin in Medford on June 11, 2003, petitioner

18

received the items upon which they had agreed in exchange for the jewelry. (Branas: T. 386-88; McLaurin: T. 737, 783). On cross-examination by defense counsel, McLaurin denied exchanging any cocaine for the jewelry. (T. 783-84). The trial court denied the prosecutor's objection to that line of questioning. (T. 784).

### c. The Investigation

On June 11, 2003, at approximately 12:28 a.m., Police Officer Rene Garcia ("Garcia") responded to a call that there had been a robbery during which a male had been shot at 40 Cedar Avenue in Medford, New York. (T. 40). In a bedroom at the end of a hallway, Garcia observed a female in her early twenties cradling a young man in her arms on the ground and crying. (T. 48, 55, 65). The young man was laying on his back, breathing and awake and the woman had her hands on his chest, which were all bloody, and was saying that he had been shot. (T. 48, 49). Another young man was also in the bedroom, just standing there. (T. 49, 55). Stump testified that when she spoke with detectives after the incident, she told them that the voice of the man wearing the ski mask and doing the talking had sounded familiar to her, but she could not place it at that time. (T. 1017, 1018, 1037-39).

At approximately 12:57 a.m. on June 11, 2003, Police Officer Wayne Maurer ("Maurer") responded to the scene with his patrol dog, "Tango," that was trained to search for human scent and narcotic drugs. (T. 596-600). After speaking with officers at the scene, Maurer left the house with Tango to search for two (2) subjects who had been in the house. (T. 601). Tango alerted Maurer that he had picked up a track in a wooded area at the corner of Old Medford and Cedar Avenues. (T. 604-05). Detectives recovered a dollar bill lying on the ground in that area.

19

(Maurer: T. 606; Detective Sergeant John Keane: T. 83; Jeffrey Luber[3]: T. 633-45, 667; Leser: T. 1057-58). Tango continued to track the human scent to Southhaven Avenue, where detectives found three (3) more dollar bills and a cardboard shoe box with another dollar bill in it, as well as three (3) more dollar bills at the intersection of Southhaven and Mount Vernon Avenues. (Maurer: T. 607-12; Keane: T. 83-84, 170, 173, 252-53; Luber: T. 633-45, 667-69; Leser: T. 1057-58). Keane testified that a lid to the type of shoe box recovered on Southhaven Avenue was recovered in one of the bedrooms of the Medford house. (T. 170). On Mount Vernon Avenue, Tango alerted Maurer to another dollar bill in the street and to a sewer or storm drain, in which detectives found clothing, including a grey sweater, a blue hooded sweatshirt, two pairs of white gloves with black speckles, a red bandana, a black "do-rag," a dark-colored Polo shirt and a black or dark blue hooded ski mask. (Mauer: T. 612-16; Keane: T. 102, 110, 256; Luber: T. 645-59, 710-11). According to Maurer, the human scent track "seemed to disappear at that point." (T. 616).

Detective Charles Leser ("Leser") testified that he arrived at the scene at approximately 2:30 a.m. on June 11, 2003, at which time he interviewed Stump and Galasso and performed a neighborhood canvas to see if anybody had seen or heard anything. (T. 1052, 1059). Leser testified that Galasso reported that a gold chain and cross had been taken from his neck, and that approximately four hundred eighty ($480.00) dollars in single dollar bills had been stolen from his bedroom. (T. 1058). According to Leser, a civilian with whom he had spoken on Mount Vernon Avenue led him to believe that a suspect had run south on Mount Vernon Avenue. (T.

---

[3] Luber is a forensic scientist with the Suffolk County Criminalistics Laboratory. (T. 623).

1055). Thereafter, Leser recovered a loaded semi-automatic handgun on the grass in front of an abandoned house on Mount Vernon Avenue near the Meat Farms parking lot. (Leser: T. 1054-56, 1058; Keane: T. 176, 244, 246). According to Keane, there were seven (7) bullets in the magazine and one "live round" in the chamber. (T. 247).

Charles Hopkins ("Hopkins"), a forensic firearms examiner employed by the Suffolk County Crime Laboratory, (T. 1236), testified that the handgun recovered was a nine millimeter Kel Tec semiautomatic pistol, which he discerned was in an operable condition. (T. 1243-44). According to Hopkins, the magazine holds ten (10) cartridges, but when he received it there were only eight (8) cartridges. (T. 1245). Hopkins testified that he also analyzed two (2) spent bullets and two (2) spent shell casings recovered at the crime scene. (T. 1245). According to Hopkins, based upon the individual tool markings found during his examination, he was able to discern that both the bullets and casings were fired from the Kel Tec pistol "to the exclusion of any other firearm." (T. 1250). In addition, Hopkins testified that the bullet hole in Berman's upper front chest area was produced from a distance of between twelve (12) to twenty-four (24) inches away, and that the bullet hole in Berman's lower front chest area was produced from a distance of between six (6) to twelve (12) inches away. (T. 1258-60).

On June 11, 2003, James C. Wilson ("Wilson"), a deputy medical examiner employed by the Suffolk County Health Department, (T. 1628), performed an autopsy on Berman. (T. 1635-36). Wilson observed two (2) "perforating" gunshot wounds, i.e., one (1) entrance wound to the upper central chest area, one (1) entrance wound to the right pericardium, to the right of the midline lower sternum region "in the roughly central chest area" and an exit wound. (T. 1641-44). According to Wilson, the lower gunshot wound entered the body "along a diagonal, * * *

very close to being grazing the surface * * *" and came from a gun that "was close enough to the body to create * * * stippling." (T. 1645-49, 1681). The bullet remained in the soft tissues in the outer layers of the body, going through skin, fat and a little muscle, and did not enter any one of Berman's major body cavities. (T. 1653, 1682). In addition, stippling marks on Berman's right hand indicated that his right hand was placed at, or almost at, the surface of the body very close to that lower entrance wound. (T. 1650-51, 1689-91). Wilson opined that the muzzle of the gun was about six (6) to nine (9) inches away from Berman's body surface when the lower gunshot wound was inflicted. (T. 1652).

Wilson testified that the nature of the upper gunshot wound indicated that the pectoral muscles were both "very strongly" contracted, suggesting that Berman's arms were outstretched in front of his body. (T. 1661-62, 1683-84, 1695-96). According to Wilson, the muzzle of the gun was about eighteen (18) to twenty-four (24) inches from Berman's body surface when the upper gunshot wound was inflicted. (T. 1664, 1673, 1687). The bullet that made the upper gunshot wound perforated Berman's sternum; entered the pericardial sac around the heart; perforated the right ventricle of the heart, diaphragm, left lobe of the liver, stomach, some fatty tissue attached to the colon, some portions of small intestine, the retroperitoneal soft tissue and lower part of the left kidney; and exited Berman's body through the lower left side of his back. (T. 1664-70). Wilson testified that the cause of Berman's death was the perforating gunshot wound to his upper central chest area. (T. 1672-73, 1682).

Keane testified that he dusted the house for fingerprints, but was only able to recover a latent print on the inside surface of the storm door which he was never able to identify. (T. 242-43, 266, 277-78, 283). In addition, Keane unsuccessfully attempted to recover fingerprints from

the twelve (12) dollar bills, the shoe box, the vinyl glove and the gun that had been recovered near the scene. (T. 256-57, 263-67, 275-77, 280).

In response to the prosecutor's question: "Now, on the next day, June 12, 2003, what, if any, investigation did you conduct on that day, sir?", Leser testified that "we met at the Medical Examiner's Office and we were made aware there was a Crime Stoppers' tip, and shortly after that I was contacted by Detective Douglas Murrell ["Murrell"] who * * * told me he had a confidential informant I should meet." (T. 1060). Leser again referred to the Crime Stoppers' tip in response to the prosecutor's question: "What other information had you obtained, if anything, on June 12ᵗʰ of 2003?" (T. 1079-80). Following that second reference, defense counsel objected on the basis that "[t]he mere fact of testifying there's a Crime Stoppers call tip is no fair. It's prejudicial," and requested a mistrial. (T. 1081-83). The trial court denied defense counsel's application on the basis that there was nothing prejudicial "because the detective did not go into what the call revealed to him." (T. 1086-88).

McLaurin testified that on June 12, 2003, after speaking with his lawyer, he contacted Murrell because he had been registered as a confidential informant for the SCPD since November 2002 in the hope of receiving a more lenient sentence on criminal charges pending against him for criminal possession of a controlled substance in the first degree and a drug sale, for which he faced an indeterminate term of imprisonment of twenty-five (25) years to life. (McLaurin: T. 739, 741-43, 767-73; Leser: T. 1205). Nonetheless, the SCPD did not make any promises to McLaurin with regard to his sentence in exchange for his cooperation in this case. (McLaurin: T. 743; Leser: T. 1205). McLaurin further testified that he had previously been convicted of attempted sale and criminal possession of a controlled substance, as well as of three

23

(3) misdemeanors for resisting arrest, petit larceny and criminal possession of a weapon. (T. 744, 752-63). In addition, McLaurin admitted to being a drug dealer in Bellport since at least 1988. (T. 763-66).

After speaking with Murrell, McLaurin brought the jewelry he had received from petitioner to Leser on June 12, 2003, told him that petitioner had been wearing a red bandana and had been with Branas when he saw him on June 10, 2003, and agreed to give him a written statement. (McLaurin: T. 739-41; Leser: T. 1061-63, 1158). Over defense counsel's objection, the trial court allowed Leser to testify that McLaurin had told him that he had purchased some jewelry from petitioner and Branas. (T. 1061-62). Leser also testified that McLaurin told him that he had met petitioner on June 10, 2003, at which time petitioner had been looking for a handgun and talking about doing a home invasion and had explained to him how he would do the home invasion by wearing a ski mask, going into the house and getting everybody down on the ground. (T. 1063-64, 1159). Defense counsel then objected to Leser's testimony as not only hearsay, but bolstering testimony, i.e., Leser's testimony was cumulative and being used to bolster McLaurin's testimony. (T. 1064-65). The trial court sustained the objection, but denied defense counsel's request for a curative instruction and application for a mistrial. (T. 1065-71). The trial court then prompted the prosecutor to question Leser only about whether he had any conversation with McLaurin and what, if anything, he did in furtherance of the investigation as a result of that conversation. (T. 1071-72).

On June 12, 2003, police showed Stump and Galasso the jewelry recovered from McLaurin, which they identified as belonging to Berman and Galasso. (Stump: T. 1011-12; Leser: T. 1201-02).

24

On June 14, 2003, McLaurin called petitioner, at Leser's request, to find out where petitioner was that day. (McLaurin: T. 746; Leser: T. 1090, 1173). Danko testified that Sprint records for the Barzallo phone indicate that at 5:12 p.m. on June 14, 2003, the Barzallo phone received a call from McLaurin's other cell phone number, (631) 987-4994. (T. 205). According to McLaurin, during that telephone conversation with petitioner, he found out that petitioner was going with Branas to a bar in Patchogue that evening. (T. 746-47). McLaurin told that information to Leser, (McLaurin: T. 747), who then set up surveillance at petitioner's house in Patchogue. (Leser: T. 1090, 1173, 1217-18; Twiname: T. 1577-78). In addition, McLaurin provided Leser with the telephone number from which petitioner had been calling him, which was (631) 764-0511, the Barzallo phone. (McLaurin: T. 747-48; Leser: T. 1075, 1202-03).

d.     The Arrest

Petitioner and Branas were arrested at approximately 11:05 p.m. on June 14, 2003 as they were walking along a street in Patchogue smoking marijuana. (Branas: T. 388-90, 457, 460, 539-40; Leser: T. 1091, 1179; Albergo: T. 1356, 1363, 1477; Twiname: T. 1576-77). Officers approached Branas and petitioner with their guns drawn, identified themselves as police officers and told them to freeze and get down on the ground, at which time Branas dropped the marijuana and got down on the ground. (Branas: T. 389-90, 540; Leser: T. 1092; Twiname: T. 1579). Leser and Detective Pasquale Albergo ("Albergo") testified that Branas first went down to the ground, then petitioner tripped over his feet and also went down to the ground, following which they were both handcuffed. (Leser: T. 1093; Albergo: T. 1357-58, 1478-79; Twiname: T. 1579-80). Branas testified that the officers handcuffed him first, then petitioner fell and dropped to

25

the ground, at which time he, too, was handcuffed. (T. 389-91). Leser, Albergo and Twiname identified petitioner in court, (Leser: T. 1093-94; Albergo: T. 1357; Twiname T. 1582-83), and Leser testified that Branas was five feet four inches (5' 4") tall and petitioner was five feet nine inches (5' 9") tall. (T. 1115).

Branas and petitioner were then placed in separate cars and brought to police headquarters in Yaphank. (Branas: T. 389, 391, 541; Leser: T. 1094-95, 1179; Albergo: T. 1358; Twiname: T. 1580). Branas was accompanied by Leser and Detective Robert Anderson ("Anderson"), while petitioner was accompanied by Detective Sergeant John Twiname ("Twiname"), Detective Walsh and Detective Albergo. (Leser: T. 1095-96; Albergo: T. 1358-60; Twiname: T. 1580). Once placed in the car, petitioner was advised that he was under arrest for an incident that occurred in Medford, but he was not questioned and no further conversation was had with him during the ride. (Albergo: T. 1364, 1482-83; Twiname: T. 1581). Twiname testified that petitioner was never threatened, assaulted or promised anything prior to arriving at police headquarters. (T. 1583).

Branas and petitioner arrived at police headquarters at approximately 11:20 p.m. (Leser: T. 1095-96; Albergo: T. 1360-61; Twiname: T. 1582). Following his arrest, the officers recovered about eighty-six dollars ($86.00) in dollar bills from Branas. (Branas: T. 392; Leser: T. 1116-17). According to Branas, he told the officers that the money came from the robbery he had committed with petitioner. (T. 393). Upon entering the interview room, petitioner's handcuffs were removed, he was searched "thoroughly," property was removed from him, including some dollar bills, and he was allowed to sit in a chair fully clothed. (Albergo: T. 1360-62, 1368-69, 1489). According to Albergo, petitioner appeared a little flushed, but was

26

emotionally calm, seemed fine, did not complain of any injuries and did not appear to be under the influence of any drugs or alcohol. (T. 1365, 1489). Twiname testified that petitioner denied being on any medication or having any injuries and appeared to be in good physical condition, coherent, calm and not intoxicated in any way. (T. 1584-85).

Thereafter, Walsh read petitioner his Miranda rights from a preprinted card and petitioner agreed to waive those rights at approximately 11:35 p.m. (Albergo: T. 1366-71, 1373, 1550-51). According to Albergo, petitioner never indicated that he did not understand his rights or asked that any of the rights be explained to him. (T. 1371). Albergo testified that neither he nor Walsh ever threatened or harmed petitioner into speaking with them or waiving his rights, nor did they promise him anything in exchange for his cooperation. (T. 1371-72, 1375).

Albergo testified that petitioner initially denied being in Medford prior to, or on the date of, the incident. (T. 1374-75). When Albergo told petitioner that witnesses claimed to have seen him in Medford on the night of the incident, he said that they were lying. (T. 1374-75). Petitioner also denied knowing what the detectives were talking about when they told him that they had found the mask and gloves. (T. 1375). At approximately 11:59 p.m., the detectives took a break from the interview, told petitioner to think about what they had discussed and left the room. (T. 1375-76, 1499). Upon leaving the room, the detectives learned that Branas had confessed to going into the house with petitioner and had implicated petitioner as the person who had shot Berman. (T. 1376, 1499-1501).

Prior to speaking with the police, Branas had been read his Miranda rights, which he also agreed to waive. (Branas: T. 393-95, 416-21, 541; Leser: T. 1097, 1109-10). Branas denied that he was threatened or coerced into, or promised anything in exchange for, waiving his rights. (T.

27

395, 541-42, 547). According to Leser, Branas initially denied any involvement in the crime "for a few minutes." (T. 1097). However, once Leser confronted Branas with the evidence they had, including the clothing and jewelry, he started crying and said that petitioner, not he, had shot Berman. (T. 1098). According to Leser, Branas confessed at approximately 11:50 p.m. (T. 1098). On cross-examination, Branas testified that he did not tell the detectives the truth until they told him that they had recovered the clothes and other evidence and that they had received "a crime scene tip," following which he started crying because his "conscience was killing [him], [he] couldn't deal with [it], [he] couldn't sleep, [he] couldn't eat * * * [he] was up for four days thinking about this day by day the whole situation in [his] head that [petitioner] shot th[at] guy for no reason in the house." (T. 461-64). On cross-examination Branas testified that the detectives questioned him until early the next morning, that he did not sleep during that time and that he had done drugs earlier that day. (T. 548-51).

When Albergo returned to petitioner's interview room at approximately 12:05 a.m. on June 15, 2003, petitioner continued to deny being in Medford on the night of the incident and to maintain that any witnesses who said that they saw him or Branas were mistaken. (T. 1377-78, 1503-04). Petitioner was then told that the individual who had attempted to have the jewelry that had been stolen during the burglary appraised had been identified, but petitioner denied any knowledge of anything being stolen. (T. 1378, 1382). Petitioner was then told that his gun had been recovered, to which he responded that he did not have a gun. (T. 1382). Detectives then showed petitioner the photographs of the clothes they had recovered from the sewer and of the handgun they had recovered in the bushes. (T. 1383-84). According to Albergo, petitioner looked at the photographs in silence while the detectives reviewed the evidence and told him that

28

Branas had confessed to robbing the house and had implicated petitioner as the shooter. (T. 1385). Petitioner then indicated that he wanted to speak with Branas. (T. 1385).

Leser asked Branas to speak with petitioner, (Branas: T. 405, 551; Leser: T. 1118, 1184; Albergo: T. 1386), and brought him to petitioner's interview room at approximately 12:40 a.m. on June 15, 2003. (Leser: T. 1118; Albergo: T. 1387). Branas told petitioner to "give up. It's over. I confessed. I told them the truth." (Branas: T. 405, 552-53; Albergo: T. 1386). Petitioner just looked at Branas, then bowed his head without saying anything. (Branas: T. 405, 553; Leser: T. 1119; Albergo: T. 1387). According to Branas, petitioner was handcuffed and sitting in a chair by a table and two (2) detectives were present in the room with him. (T. 552). According to Leser, petitioner was fully clothed at that time. (T. 1190-93). Leser testified that although he heard yelling and raised voices coming from petitioner's interview room, he did not hear any screaming. (T. 1191-92, 1218-19). Leser also testified that he never observed any physical injuries on petitioner at headquarters. (T. 1219, 1221).

After Branas was taken back to his interview room, petitioner asked detectives for a few minutes to think, which they gave him. (T. 1387-88). When detectives returned a few minutes later, petitioner told them that he did not mean to shoot and that he was sorry. (T. 1388). According to Albergo, petitioner said that "the guy was on [him] and [he] shot." (T. 1388). Albergo further testified that petitioner told him that he entered the house through the front door; that a guy from whom he bought weed in Bellport had told him that the guy in the house was a weed dealer; that he had bought the gun from a weed house on Hoffman Avenue in Bellport from a guy named "June Bug;" that a guy whom he knew only as "Boo" had driven them to the scene; that he had sold the jewelry to a guy named Kelvin; and that he had brought the gloves and ski

29

mask from work. (T. 1388). According to Albergo, a little before 1:00 a.m. on June 15, 2003, petitioner agreed to give a written statement. (T. 1389).

Prior to giving the written statement, petitioner was taken to the bathroom, following which his Miranda rights were again read to him from a preprinted form. (Albergo: T. 1393-95; Twiname: T. 1586-87). Twiname testified that neither he nor Walsh, who accompanied petitioner to the bathroom, ever threatened or harmed petitioner, or promised petitioner anything in exchange for his statement. (T. 1587). Petitioner did not ask that any of the rights be explained to him or indicate that he did not understand them, and he again waived his constitutional rights at 1:10 a.m. (T. 1395-96, 1521-22). Albergo wrote petitioner's statement based upon the answers he gave to the detectives' questions, and the statement was then reviewed, corrected, initialed and signed by petitioner. (T. 1390, 1397-98, 1407-14, 1506, 1508-10, 1512, 1516, 1551-52). Petitioner's statement, as redacted on consent by both parties, was admitted into evidence. (T. 1391). Albergo read the statement, the relevant portions of which are as follows:

> "The night I robbed the house I was told by Johnny Booker that the guy in the house in Medford had twenty pounds of marijuana and eight thousand dollars. * * * I finally said I would do it after Boo told me if I looked good I would find the hundred G's, meaning a hundred thousand dollars. * * * Boo said there would be only one guy in the house and the safe would be in the bedroom. Nothing Boo said matched up. There was [sic] three people in the house and we never found the safe. After I talked to Boo and his friend, I went and got [Branas]. * * * [Branas] and me decided to do the robbery. * * * Boo and his friend drove me and [Branas] to this house in Medford. I had a dark wool face mask * * *. I also had a red bandana I wore on my head. I gave the bandana to [Branas] to use as a mask. I used the wool mask. Boo had a nine .9 [millimeter handgun] with him that he gave to me, gave me to use. He touched the gun with gloves. He never touched [it] with his bare hands. I touched it with gloves on. * * * [Branas's] sister bought the gloves we used at the 7-Eleven on Montauk Highway in Bellport. She went in and bought the gloves just before we went back to Boo's house. * * * After Boo gave me the [gun], he and his friend dropped me and

[Branas] off on the corner by the house. They were supposed to pick us up on the next block from that corner. [Branas] and me went to the front door. It wasn't locked, so we walked right in. * * * Boo told us the dude's bedroom was the first on the right. The dude was in bed reading a book. I pointed the [gun] at him and told him to get on the floor. When he got on the floor, I asked who else was in the house. The dude said there was two people in the other bedroom. I took the dude to the other bedroom. [Branas] was looking around for the safe. When I got to the other room, I woke up the people. It was a guy and a girl. I told them to lie down on the floor. All three people were on the floor. I asked them where was the twenty pounds of weed and the money. The girl started telling me where some money was. She told me she had money in her pocketbook. About that time, [Branas] told me he found a lot of money. I thought the people weren't telling me everything, so I took the girl out into the hall. I did this because she was the only one saying anything about money. The dude in the first bedroom asked, what weed, when I first asked where it was. I took my eyes off the girl in the hall and she tried to run. [Branas] caught her and brought her back. When he brought her back, I hit her and told her not to run. When I hit her, I turned my back on the two guys. That's when the one guy rushed me. When I turned around, he was on me. He grabbed for the gun and that [was] when I shot. It busted off two times. After I shot, we ran out [of] the house. [Branas] had some money and jewelry he found in the house. We ran to where Boo and his friend were supposed to pick us up. They weren't there. We ran down a lot of different streets and ended up by the gas station and Meat Farms. While we were running, I got rid of my shirt, mask, gloves and [Branas's] bandana. [Branas] got rid of some of his clothes and his gloves. We threw them down a storm drain. When we got near the gas station, I chucked the gun in some bushes near the street behind the gas station. Right after that, Boo and his friend scooped us up and drove us to Bellport. Me and [Branas] told them what happened and they didn't want any of what we stole. * * * I know Boo wouldn't give me a gun that wasn't loaded. No one would take an unloaded gun to do a robbery. That was the only thing that Boo did that was right. * * * When we were in [Branas's] sister's car, we counted the money. There was only three hundred dollar bills. [Branas] also got two gold chains with crosses and a gold ring. The next day I called this guy Jesse and told him I had jewelry to sell. Me and [Branas] met Jesse down the block from [Branas's] house. I told him I wanted fifteen hundred dollars for the jewelry. He left and told me to call when I had a better price. I called him fifteen minutes later. He came back an hour later. We made a deal about the jewelry. He was supposed to give us seven hundred dollars. We gave him the jewelry and he told us he would meet us at Island Recreation with the money. * * * We waited and met Jesse in the parking lot * * *. I have read this eight page statement that I gave to Detective Albergo and swear that it is all true. Signed, [petitioner]."

(T. 1398-1402). Petitioner also made a sketch of the area where he was dropped off and picked

up, which was admitted into evidence without objection. (T. 1402-06). Albergo testified that nobody ever threatened or harmed petitioner into giving, or promised petitioner anything in exchange for, the statement, (T. 1414-15, 1512-13), and that petitioner never indicated that he did not want to sign the statement or that it was not accurate. (T. 1514). According to Albergo, the entire process, including petitioner's review and signing of the statement, took "a little under three hours." (T. 1415, 1510). Albergo testified that about midway through the process, they took a break to give petitioner a soda because he said he was thirsty, and prior to the review, at approximately 3:30 a.m., they took a seven (7) minute break to take petitioner to the bathroom. (T. 1415-17, 1510). Petitioner signed the statement at approximately 4:05 or 4:10 a.m. (T. 1417). On cross-examination, defense counsel questioned Albergo about the consistencies between Branas's and petitioner's written statements. (T. 1507).

After completion of petitioner's written statement, detectives showed him four (4) photographs and asked him what they meant to him. (T. 1418). Petitioner wrote on, and signed, the photographs, which were admitted into evidence without objection. (T. 1419-20, 1553-55). On the photograph depicting the Medford house, petitioner wrote: "this is the house we went in. I recognize the car." (T. 1422-23). On the photograph depicting a bedroom in the house, petitioner marked an "X" on the place where he indicated that he "shot the guy." (T. 1424-25). On the photograph depicting the handgun, petitioner wrote: "this is the gun I used." (T. 1425-26). On an aerial photograph of the area near the house, petitioner indicated where he threw the gun and where "Boo" had picked them up. (T. 1426-28). Petitioner completed reviewing the photographs at approximately 4:25 a.m. (T. 1428). Albergo testified that petitioner was not threatened into compliance. (T. 1428-29).

32

Albergo testified that after the photographs had been completed, they took a short break, following which petitioner was asked if he would give a videotaped statement before an assistant district attorney. (T. 1429). Petitioner refused and signed a consent form memorializing his refusal at approximately 4:30 or 4:35 a.m. (T. 1429-32, 1538, 1555). The consent form was admitted into evidence without objection. (T. 1430-31). Petitioner also agreed to submit to a buccal swab, i.e., a swab was rubbed inside of the mouth and then placed into a sterilized box to record his DNA. (Albergo: T. 1441-42; Twiname: T. 1588-89). Twiname testified that he witnessed petitioner consent to the buccal swab and sign the consent form at 9:20 a.m. (T. 1589-92). The consent form was then admitted into evidence without objection. (T. 1590). Twiname also witnessed the buccal swab being performed on petitioner. (T. 1592-93).

Albergo denied ever threatening or harming petitioner, or promising him anything in exchange for the information he provided to them, (T. 1457, 1504, 1519), and testified that he did not put on latex gloves prior to his interview with petitioner. (T. 1520). Twiname testified that petitioner was "periodically" given food and drink during the interview process, including breakfast around 9:00 a.m. on June 15, 2003. (T. 1594).

At approximately 9:45 a.m., after petitioner had been interviewed and processed, Albergo escorted petitioner to have photographs taken of his physical condition, as per standard procedure. (T. 1435-37, 1538-45). Petitioner was also permitted to make telephone calls and he made two (2) calls at 10:23 a.m. and 10:30 a.m. on June 15, 2003. (T. 1594-95, 1603-04, 1607, 1609).

At approximately 11:30 a.m. on June 15, 2003, petitioner was taken to the Fifth Precinct. (T. 1441-42). Albergo testified that at approximately 8:35 p.m. that evening, he interviewed

33

petitioner to prepare a questionnaire for the district attorney's office. (T. 1442). The prosecutor

then asked: "What did you ask him, sir?" (T. 1442). In response, Albergo testified: "Well, just

to backtrack, June of 2003, the death penalty was still in effect and –" (T. 1443). Defense

counsel objected and the prosecutor said to Albergo: "I would ask you to not state that and just

proceed with the question I asked you, sir." (T. 1443). Defense counsel then moved for a

mistrial on the basis that petitioner was prejudiced by the impression that "this case was a death

penalty eligible case." (T. 1443-45). The trial court indicated that it would give the jury a

curative instruction. (T. 1444). Defense counsel maintained that a curative instruction would not

cure the prejudice to petitioner and the trial court noted his exception. (T. 1450). Thereafter, the

trial court instructed the jury as follows:

> "Ladies and gentlemen of the jury, during the course of direct examination of
> Detective Albergo, there was the words as to a death penalty questionnaire. Let
> me instruct the jury, and I'll make it crystal clear, this is not a death penalty case
> for your concern. Because it is not a death penalty case, your sole function here is
> what I said from the outset, to determine, you will be determining what the facts
> are, the judges of the facts. The burden of proof is to prove the defendant guilty
> beyond a reasonable doubt. And I'll give you all those instructions at the
> appropriate time if I give you the case for deliberations. Do not speculate what
> the sentence may be, that's my duty and obligation to impose if, in fact, you find
> the defendant guilty on either one or both of the charges. Let me repeat again, if
> the defendant is found not guilty on both, either one or both of the charges, he's
> released, there is no sentence to impose. If you find him guilty on one or both of
> the charges, then it's my, within my province to determine what the sentence is.
> All right? So I ask you not to consider what was said there, don't dwell on it, it's
> not a death penalty case. Okay? I have your assurance? Anybody not clear on
> which I just stated? Okay I have an affirmative.

(T. 1451-52). Defense counsel objected to the curative instruction on the basis that it was "not

curative enough" and it raised new problems because the two charges of murder in the first

degree and murder in the second degree were mutually exclusive and it suggested that petitioner

was "not at liberty now." (T. 1453-54). Defense counsel moved for a mistrial on the basis that

the curative instruction was "vague and ambiguous and it [gave] the impression of custodial status * * *." (T. 1454). The trial court denied the motion for a mistrial and indicated that it would not give any further curative instructions "on that area." (T. 1454-55). Following Albergo's direct examination, defense counsel requested that the trial court reconsider his motions for a mistrial. (T. 1460).

Albergo testified that he then asked petitioner about a man named Omar Goher ("Goher") and petitioner responded that he had not seen Goher in over a year. (T. 1455, 1531-32, 1534). Albergo then asked petitioner if the girl he had hit in the house looked familiar, to which petitioner responded "that's Heather with the Honda, I told [Branas] she looked familiar." (T. 1456-57, 1534). On redirect examination, Albergo testified that prior to this interview, he had received information that Stump had recognized petitioner as a friend of Goher. (T. 1535-36).

At approximately 2:05 a.m. on June 15, 2003, Branas also made a written confession, which was handwritten by detectives based upon Branas's answers to the detectives' questions, read to Branas because he cannot read or write and signed by Branas, (Branas: T. 422-24, 554; Leser: T. 1099, 1107-09, 1224), and drew a sketch indicating the streets he and petitioner had run down. (Branas: T. 396-98, 401-02, 437, 554-55, 559-560, 565; Leser: T. 1112). Prior to taking that written statement, Leser again administered Miranda warnings to Branas, which Branas again agreed to waive. (T. 1099, 1106-07). Leser testified that Branas freely and voluntarily agreed to speak with detectives and to provide the written statement. (T. 1107). During the testimony of both Branas and Leser, defense counsel objected to the admission of Branas's confession into evidence and its use at trial. (T. 405-06, 1100-03). Once the prosecutor agreed to redact portions of the statement and defense counsel concurred with the redactions made, the

35

confession was admitted into evidence during Branas's testimony. (T. 406-07, 415). The trial court overruled defense counsel's subsequent objection to the admission and use of the confession during Leser's testimony as bolstering of Branas's testimony, and denied defense counsel's request for a curative instruction, but limited the extent of the prosecutor's questions regarding the confession. (T. 1104-05).

Branas was also shown eight (8) photographs, on which he made statements regarding what was depicted in each one. (Branas: T. 400, 424, 565-66; Leser: T. 1110-12). Specifically, Branas wrote on one of the pictures "money boxes I took," (T. 424); in another he wrote "[petitioner] put them on the floor," (T. 425); in another he wrote "room with money," (T. 426); in another he wrote "hall to bedrooms," (T. 426); in another he wrote "gray white sweater," "gloves we wore" and "clothes we put in sewer," (T. 427); in another he wrote "gun that Boo gave [petitioner]" and "[petitioner] shot guy with this gun," (T. 427-28); and in another he wrote "the house where [petitioner] shot the guy and we robbed," (T. 430). Branas refused to make a videotaped statement, (Branas: T. 403, 440-41, 554; Leser: T. 1112-13), but agreed to submit to a buccal swab. (Branas: T. 404, 441-42, 554; Leser: T. 1114). According to Leser, Branas signed the consent form for the buccal swab at approximately 7:25 a.m. on June 15, 2003. (T. 1114). The pictures, sketch and consent forms were admitted into evidence without objection. (T. 400-02). According to Leser, Branas was not forced or threatened in any way to cooperate in the investigation, (T. 1115, 1187, 1219), and neither Branas nor petitioner were ever harmed or threatened by any member of the SCPD. (T. 1218).

Branas testified that he pled guilty to murder in the second degree in return for a negotiated sentence to an indeterminate term of imprisonment of nineteen (19) years to life. (T.

444-45, 567-69). Branas also testified that he had previously been convicted of selling cocaine in 1998; of attempted assault in the second degree in 1999 stemming from a bar fight; and of possession of cocaine in 2001 or 2002. (T. 448-50, 498-507).

### e. Continued Investigation

Stump testified that the police department notified her that two (2) people had been arrested and identified them to her as Branas and petitioner. (T. 1017-18). According to Stump, after she learned the names of the suspects, she learned that one of them was a friend of Goher, her ex-boyfriend, with whom she had spoken "a bunch of times before." (T. 1018-19, 1021-22, 1040, 1046). Stump identified the voice of the man doing all of the talking during the burglary on June 11, 2003 as petitioner. (T. 1018, 1020, 1037-40, 1047). Stump testified that she met petitioner "many times" at Goher's house, that petitioner had been in a car she used to have, and that she had last seen petitioner about six (6) years earlier. (T. 1019, 1040-41). Stump identified petitioner in court as the man with the ski mask and gun whose voice she heard in Berman's bedroom on June 11, 2003. (T. 1019-20).

On June 16, 2003, Helen Lee-Wyss ("Lee-Wyss"), a forensic scientist employed by the Suffolk County Crime Lab, (T. 884), received crime scene samples related to the June 11, 2003 homicide at Cedar Avenue in Medford, New York and known buccal swabs from petitioner, Branas and Berman for examination to determine if she could identify any bodily fluid stain or DNA. (T. 902-04, 907). Specifically, Lee-Wyss received two (2) pairs of gloves, one (1) black face mask, one (1) black long sleeve tee-shirt, one (1) gray pullover sweater, one (1) blue jacket, one (1) black do-rag and one (1) red bandana. (T. 905). Lee-Wyss further testified that in

addition to her examination of those items, she did tape lifts of the clothing which she sent to the SCPD property bureau. (T. 907, 910, 916).

Lee-Wyss testified that she did not observe any visible stains or blood on, or recover anything of serological value from, one (1) pair of gloves, the face mask or the tee-shirt. (T. 908-10). Lee-Wyss observed a "brownish stain" from the blue jacket, which testified negative for blood, and a "whitish stain" inside the jacket, which tested negative for the presence of sperm, semen or saliva. (T. 911-12, 957, 966). Ultimately, nothing of any serological value was recovered from the jacket. (T. 912). Lee-Wyss also testified that she observed a small blood stain in one of the gloves packaged in the same bag as the jacket. (T. 913-15). Otherwise, Lee-Wyss did not recover anything of serological value on any of the other articles of clothing she examined. (T. 915).

In addition, Lee-Wyss swabbed the neck area and both sleeves of the jacket, tee-shirt and gray pullover sweater, the inside of the gloves, the forehead area of the do-rag and bandana and the nose and mouth areas of the ski mask, for DNA and performed a DNA analysis of those items. (T. 913, 916-19). Lee-Wyss testified that the DNA recovered from the blood found in the interior of one of the gloves that had been packaged with the gray sweatshirt, red bandana and do-rag exactly matched Branas's DNA sample, with the statistical probability of the DNA being from somebody else in the quadrillions. (T. 926-27, 937-38, 968).

Upon her DNA analysis of the gloves packaged with the ski mask and tee-shirt, Lee-Wyss was unable to determine an exact match for the DNA recovered because the genetic markers present came from more than one (1) person, but ascertained that it came from a male individual. (T. 927-28). According to Lee-Wyss, petitioner was a "major component" of the DNA found

inside the gloves packaged with the ski mask and tee-shirt and the statistical probability that the major component of DNA recovered from the gloves belonging to someone other than petitioner was one (1) in seventy-six and a half trillion (76,500,000,000,000) for the United States Caucasian population, one (1) in twenty-nine point nine trillion (29,900,000,000,000) for the United States African-American population, and one (1) in thirty-one point seven trillion (31,700,000,000,000) for the United States Hispanic population. (T. 929-31, 975). Lee-Wyss was unable to determine who the minor component of the DNA recovered from the gloves was, but she excluded Berman and Branas based upon the genetic markers present. (T. 928-29, 931-32).

Lee-Wyss was unable to determine even the gender of the DNA recovered from the ski mask. (T. 932). However, Lee-Wyss excluded petitioner and Berman from the DNA recovered from the ski mask, but was unable to exclude Branas or to calculate any statistical number of the likelihood that the DNA came from someone other than Branas. (T. 933-35, 965-66, 969). In other words, Lee-Wyss never matched the DNA recovered from the ski mask to petitioner, Branas or Berman. (T. 934, 965, 969).

Lee-Wyss determined that the DNA profile from the gray pullover sweater matched more than one (1) person, that Branas was a major component of that DNA, and that Berman and petitioner were excluded as minor components of that DNA. (T. 935, 966). According to Lee-Wyss, the statistical probability of the major component of DNA being from someone other than Branas is one (1) in one hundred forty-nine billion (149,000,000,000) for the United States Caucasian population, one (1) in two hundred ten billion (210,000,000,000) for the United States African-American population and one (1) in six hundred eighty-eight billion (688,000,000,000)

for the United States Hispanic population. (T. 935-36).

Lee-Wyss determined that Branas was included, and Berman and petitioner were excluded, as contributors to the mixture of DNA recovered from the blue jacket and do-rag. (T. 936-39, 966-67). According to Lee-Wyss, the probability of a randomly selected individual being a contributor to the mixture of DNA recovered from the blue sweat jacket was "extremely low," i.e., one (1) in thirteen (13) for the United States Caucasian population, one (1) in sixteen (16) for the United States African-American population and one (1) in eleven (11) for the United States Hispanic population. (T. 936-37). The probability of a randomly selected individual being a contributor to the mixture of DNA recovered from the do-rag is one (1) in four thousand eight hundred one (4,801) for the United States Caucasian population, one (1) in fifty-five thousand forty-two (55,042) for the United States African-American population and one (1) in fifteen thousand seven hundred eighty-one (15,781) for the United States Hispanic population. (T. 936-37, 940-41).

Lee-Wyss determined that at least four (4) people contributed to the DNA recovered from the red bandana, and that both Branas and petitioner were included as contributors. (T. 939-40, 967). Lee-Wyss was unable to determine any major or minor component of that DNA profile. (T. 940, 968).

Lee-Wyss was unable to obtain any result from her DNA analysis of the tee-shirt. (T. 941, 965).

At the close of the prosecutor's case, defense counsel moved for a trial order of dismissal. (T. 1703-04). The trial court denied that motion. (T. 1705). Defense counsel then moved for dismissal on the basis that the prosecutor failed to provide certain evidence to the defense,

40

including tape lifts of Berman's body, "trace evidence of questioned hairs" and tape lifts from two (2) pairs of sneakers and Berman's clothing, shirt and jeans. (T. 1705-06). In response, the prosecutor represented that "All that material is available to the defense if they so wish to have it. It's been available the whole time. The defense is aware of that." (T. 1706). The trial court denied the motion. (T. 1706).

### 3. The Defense

Prior to presenting any defense, defense counsel moved, *inter alia*, to have a photograph depicting petitioner's thighs and testicles, that had been taken on June 18, 2003, redacted to omit a tattoo on his left upper thigh that he believed would be prejudicial to petitioner prior to its admission into evidence. (T. 1728-30). Over the prosecutor's objection, the trial court ruled that the photograph could be admitted into evidence, (T. 1731), but denied defense counsel's request to redact the photograph. (T. 1732-33). Defense counsel objected to that ruling. (T. 1734).

William Mirra ("Mirra"), a criminal identification technician employed by the Suffolk County Sheriff's Office, testified that he took photographs of petitioner on June 18, 2003 at defense counsel's request. (T. 1736, 1740-41). The photographs that Mirra took of petitioner's feet, full body, face and forearms were admitted into evidence without objection. (T. 1739).

Defense counsel also introduced petitioner's medical records into evidence without objection. (T. 1744-45). The defense then rested. (T. 1745).

### 4. Rebuttal

Detective Anthony Piazza ("Piazza") testified that he assisted in taking the stand-up

photographs of petitioner on June 15, 2003 at approximately 9:45 a.m. (T. 1812-15). Piazza first photographed petitioner fully clothed in order to document how he found him, then had him disrobe to his underwear. (T. 1817). Piazza testified that he did not observe any injuries to petitioner's body while he was photographing him and that if he had observed any injuries, he would have photographed them. (T. 1818, 1821-22). Piazza further testified that both petitioner and Branas had "crinkled up toes" in the photographs of them in their underwear and that the building had been air-conditioned and cold at the time the photographs were taken. (T. 1819-20). On cross-examination, Piazza testified that he did not observe petitioner's groin area or testicles. (T. 1822-23).

Deputy Sheriff Brett Hamilton ("Hamilton") testified that he interviewed petitioner on June 16, 2003, when he arrived at the Suffolk County Jail. (T. 1753, 1756). During that interview, Hamilton asked petitioner if he was ill or injured and petitioner responded "no." (T. 1755-56, 1775, 1782-83). In addition, Hamilton did not notice any injuries on petitioner. (T. 1761-62, 75). Hamilton further testified that he asked petitioner if he had "any physical problems or injuries," to which petitioner responded "no." (T. 1766, 1782-83). Moreover, Hamilton testified that petitioner was examined by the jail's medical staff and was photographed upon his entry into the jail. (T. 1767-69). On cross-examination, Hamilton testified that he did not observe petitioner's testicles, inner thighs or toes. (T. 1781-82).

David White ("White"), a registered nurse supervisor at the Suffolk County jail, (T. 1788), testified that he completed a medical questionnaire with respect to petitioner on June 16, 2003 at approximately 8:14 p.m. (T. 1790). Defense counsel's objection to White's testimony was overruled. (T. 1792-94). White testified that he noted on the questionnaire that petitioner

42

denied any current major medical problem; that petitioner complained that he had been involved in an altercation when he was arrested; and that petitioner had specifically complained that "they" had stomped on the toes of his right foot, that he had been kicked in the groin and of "handcuff compression." (T. 1796-97). Upon examination, White did not observe any obvious injury, redness, swelling or bruising to petitioner's right foot, but did observe some redness on his right wrist consistent with handcuff compression and a "minor ecchymotic area," or "small black and blue," on his right knee. (T. 1798-1801, 1803). White testified that petitioner did not appear to have any difficulty walking or to be hunched over and that petitioner did not complain about any injury to his right knee. (T. 1802-03). On cross-examination, White testified that he did not physically examine petitioner's groin area. (T. 1808-09).

### 5. Requests to Charge

At the close of all the evidence, defense counsel renewed his motion to dismiss, (T. 1844), and requested that the trial court charge the jury "in the area of corroboration of a [sic] accomplice status [as a] matter of law" with respect to McLaurin. (T. 1827). Defense counsel argued that since McLaurin "was the one who received the stolen property after the fact" and "was involved in the enterprise * * * of taking the jewelry and transferring it to others" he was an accomplice as a matter of law. (T. 1827). The trial court denied the request to charge, ruling that "there [was] no testimony that [McLaurin] was at the scene during the actual commission of the crimes as alleged here, and also there's no testimony that he was a part of any prearranged arrangements [] that if there were proceeds of the crime, that he would receive the proceeds of the crime." (T. 1827-28). Defense counsel objected to that ruling. (T. 1829). The trial court

also denied the motion to dismiss. (T. 1845).

### 6. Summations

Prior to summations, the trial court instructed the jury, in relevant part, as follows:

> "[I]n making their respective summations, the attorneys will review the evidence you have heard and seen during the course of the trial and will suggest to you certain inferences or conclusions which they in their opinion believe may be properly drawn from the evidence. This is the purpose of summations.
>
> Ladies and gentlemen, if you find that a particular attorney's analysis of the evidence is correct, that the evidence as summed up and analyzed by the attorney is accurate, and if you find that the inferences and conclusions which you are asked to draw from the evidence are logical and sensible, then you are at liberty to adopt such inferences and conclusions either in whole or in part.
>
> On the other hand, if you believe that either counsels' analysis of the facts or of the inferences or conclusions which you have been asked to draw therefrom are illogical, not warranted by the evidence, then you may disregard same either in whole or in part and draw your own conclusions from the evidence which you believe to be truthful. Bear in mind, members of the jury, nothing that counsel may say in their summations is evidence in the case. * * *
>
> You have heard the evidence. You and you alone are the sole and exclusive judges of the facts in this case * * *."

(T. 1847-48). In addition, during summations and its charge to the jury, the trial court reiterated that comments made during summation were not evidence and that the jurors were the exclusive judges of the facts. (T. 1884, 1958, 1959).

### 7. Verdict and Sentence

On November 18, 2004, the jury found petitioner guilty of murder in the first degree and murder in the second degree. (T. 2036).

On December 15, 2004, petitioner was sentenced to concurrent terms of imprisonment of

44

life without the possibility of parole for the conviction of murder in the first degree and twenty-five (25) years to life for the conviction of murder in the second degree. (S. 27).

B.    Procedural Background

Petitioner appealed his judgment of conviction to the Appellate Division on the grounds, *inter alia*: (1) that it was error for the trial court (a) to fail to instruct the jury that McLaurin was his accomplice as a matter of law and, therefore, that his testimony must be corroborated, (b) to deny his motion to suppress his statements to the police since those statements were involuntarily made, (c) to permit the prosecution to bolster the trial testimony of Branas with his prior consistent statement and to fail to strike the bolstering testimony of Leser, or to limit the purpose for which such evidence could be considered, (d) to preclude the defense from introducing a redacted photograph at trial depicting the injuries he allegedly received during his interrogation, (e) to deny defense counsel's request to produce the personnel files of the investigating officers who conducted petitioner's interrogation in order to establish their use of physical force during his interrogation and (f) to interfere with the questioning of witnesses during the trial and to elicit incriminating evidence regarding his custodial status that was otherwise inadmissible; (2) that the charge of murder in the second degree in the indictment should have been dismissed once petitioner was convicted of murder in the first degree; (3) that the verdict was legally insufficient and against the weight of the evidence; (4) that the sentence imposed was harsh and excessive; (5) that there was no probable cause for his arrest; (6) that the prosecutor's misconduct, including her solicitation of false testimony at trial, violated his right to a fair trial; and (7) that he was denied the effective assistance of counsel at trial.

45

By order dated February 19, 2008, the Appellate Division modified the judgment by vacating the conviction of murder in the second degree and the sentence imposed thereon and dismissing that count of the indictment, and otherwise affirmed the judgment of conviction, finding, *inter alia*: (1) that the trial court properly refused to submit to the jury the issue of whether McLaurin was petitioner's accomplice because "no rational trier of fact could conclude that [McLaurin] was an accomplice of the [petitioner];" (2) that the hearing court properly denied petitioner's motion to suppress his statements to the police; (3) that the improper admission of bolstering testimony was harmless; (4) that the conviction of murder in the second degree, as well as the sentence imposed thereon, had to be vacated, and that count of the indictment dismissed, "because that charge constitutes an inclusory concurrent count of the conviction of murder in the first degree;" (5) that the evidence was legally sufficient to establish petitioner's guilt of murder in the first degree beyond a reasonable doubt and the verdict was not against the weight of the evidence; (6) that the sentence imposed was not excessive; (7) that petitioner's ineffective assistance of counsel claim was without merit; and (8) that petitioner's remaining contentions were either "without merit or [did] not warrant reversal of the judgment." People v. Villafane, 48 A.D.3d 712, 713-14, 852 N.Y.S.2d 301 (2d Dept. 2008). On May 13, 2008, the Court of Appeals of the State of New York denied petitioner's application for leave to appeal to that court from the February 19, 2008 order of the Appellate Division. People v. Villafane, 10 N.Y.3d 871, 860 N.Y.S.2d 498, 890 N.E.2d 261 (2008).

On October 5, 2009, petitioner filed in the state court a motion pursuant to New York Criminal Procedure Law § 440.10 ("the 440.10 motion"), seeking to vacate the judgment of conviction on the basis, *inter alia*, that his counsel rendered meaningless representation at trial.

On October 26, 2009, the state court (Weber, J.) denied petitioner's 440.10 motion without a hearing. On March 19, 2010, the Appellate Division denied petitioner's application for leave to appeal to that court from the October 26, 2009 order.

On December 7, 2009, petitioner filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent filed his return on February 11, 2010. In April 2010, petitioner filed an amended petition[4] alleging: (1) that the trial court violated his Fifth, Sixth and/or Fourteenth Amendment rights (a) by refusing to charge the jury that McLaurin was his accomplice as a matter of law and, thus, that "his testimony should be supported by corroborating evidence," (Petitioner's Amended Memorandum of Law [Pet. Mem.], at 4), (Ground One), (b) by permitting his confession, which was involuntarily made, to be admitted into evidence (Ground Two), (c) by improperly precluding him from introducing into evidence a redacted photograph depicting the injuries to his groin area that he allegedly received during his interrogation, (Ground Three), (d) by "continually intrud[ing] during direct and cross-examination of witnesses and elicit[ing] incriminating evidence which was otherwise inadmissible," (Ground Five), and (e) by denying his request for disclosure of the personnel files of the officers who conducted his interrogation in order to establish that "physical force was an interrogation tactic often used by th[o]se detective[s]," (Ground Nine)[5]; (2) that the prosecution's

---

[4] Since, *inter alia*, the amended petition does not raise any new claims, but rather seeks only to clarify the claims raised in petitioner's original petition, (see Doc. No. 14), and it does not require any further response by respondent, petitioner's application for leave to amend the petition is granted and the amended petition is accepted for filing *nunc pro tunc*.

[5] By letter dated April 25, 2011, petitioner requested that the Court disregard "Ground Nine" in his amended petition. (Doc. No. 31). Accordingly, the Court deems this claim to have been voluntarily withdrawn by petitioner.

erroneous admission of bolstering testimony was not harmless error and violated his Fifth and Fourteenth Amendment rights (Ground Four); (3) that he was denied his Sixth Amendment right to the effective assistance of counsel at trial (Ground Six); (4) that prosecutorial misconduct violated his Fifth and Fourteenth Amendment rights (Ground Seven); and (5) that the verdict was legally insufficient and against the weight of the evidence (Ground Eight).

Petitioner now moves: (1) for the appointment of counsel in this proceeding and (2) to stay this proceeding to permit him to exhaust his ineffective assistance of trial counsel claim in state court. Petitioner's application to stay this proceeding is based upon a second 440.10 motion he filed in state court in October 2010 seeking to vacate his judgment of conviction on the ground of ineffective assistance of trial counsel. However, by letter dated May 10, 2011, petitioner advised the Court that he had subsequently withdrawn his second 440.10 motion in state court. Accordingly, petitioner's application to stay this proceeding (Doc. No. 25) is denied as moot.

## II.    Discussion

### A.    Appointment of Counsel

"There is no constitutional right to representation by counsel in habeas corpus proceedings." Green v. Abrams, 984 F.2d 41 (2d Cir. 1993) (internal quotations and citation omitted); see also Wright v. West, 505 U.S. 277, 293, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (recognizing that the Constitution does not guarantee the right to counsel on habeas review). Appointment of counsel in habeas corpus proceedings is governed by 18 U.S.C. § 3006A(a)(2)(B), which provides in relevant part that whenever the district court "determines that

the interests of justice so require, representation may be provided for any financially eligible person who - * * * is seeking relief under section * * * 2254 * * * of title 28." Although Rules 6(a) and 8(c) of the Rules Governing Section 2254 Cases in the United States District Courts (the Habeas Corpus Rules) provide that an attorney must be appointed for a petitioner who otherwise qualifies to have counsel appointed under § 3006A "[i]f necessary for effective discovery," and "[i]f an evidentiary hearing is warranted," respectively, the appointment of counsel at any other stage of a habeas corpus proceeding is discretionary. See Cardova-Diaz v. Brown, 10 Civ. 5133, 2011 WL 3665377, at * 1 (S.D.N.Y. Aug. 15, 2011); Cruz v. Smith, No. 05 Civ. 10703, 2007 WL 80865, at *1 (S.D.N.Y. Jan. 10, 2007).

A request for the appointment of counsel in a habeas corpus proceeding is analyzed in the same manner as any other application for the appointment of counsel in civil cases pursuant to 28 U.S.C. § 1915(e)(1). See Razzoli v. U.S. Parole Commission, 10-CV-1842, 2010 WL 5027548, at * 2 (E.D.N.Y. Dec. 2, 2010); Tarafa v. Artus, 10 Civ. 3870, 2010 WL 2545769, at * 1 (S.D.N.Y. June 9, 2010). When deciding whether to assign counsel to an indigent civil litigant under 28 U.S.C. § 1915(e)(1) the threshold inquiry is whether there is "some likelihood of merit" to the litigant's position. Johnston v. Maha, 606 F.3d 39, 41 (2d Cir. 2010) (quoting Cooper v. A. Sargenti Co., 877 F.2d 170, 174 (2d Cir. 1989)); see also Leftridge v. Connecticut State Trooper Officer No. 1283, 640 F.3d 62, 68-9 (2d Cir. 2011) (holding that a motion for appointment of counsel is properly denied if the litigant's "chances of success are highly dubious."); Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986) (holding that the district judge should first determine whether the indigent's position seems likely to be of substance). "[C]ounsel should not be appointed in a case where the merits of the indigent's claim are thin

49

and his chances of prevailing are therefore poor." <u>Carmona v. U.S. Bureau of Prisons</u>, 243 F.3d

629, 632 (2d Cir. 2001).

If the Court finds that the plaintiff's claim is of substance, it should next consider the

following factors:

> "[T]he indigent's ability to investigate the crucial facts, whether conflicting
> evidence implicating the need for cross-examination will be the major proof
> presented to the fact finder, the indigent's ability to present the case, the
> complexity of the legal issues and any special reason in that case why appointment
> of counsel would be more likely to lead to a just determination."

<u>Hodge</u>, 802 F.2d at 61-62; <u>see also</u> <u>Carmona</u> 243 F.3d at 632 (holding that only after an initial

finding that a claim is likely one of substance should the court consider secondary factors such as

the factual and legal complexity of the case, the ability of the litigant to navigate the legal

minefield unassisted, and any other reason why in the particular case appointment of counsel

would more probably lead to a just resolution of the dispute). However, those factors are not

restrictive and "[e]ach case must be decided on its own facts." <u>Hodge</u>, 802 F.2d at 61.

The appointment of counsel is not warranted in this case since, *inter alia*: (1) petitioner's

claims are without merit; (2) the claims in petitioner's amended petition are adequately and

competently set forth either by petitioner in his amended petition or by petitioner's appellate

counsel and petitioner in their briefs filed on the state court appeal; (3) the legal issues presented

in this proceeding are not particularly complex; and (4) there is no special reason to appoint

counsel. Accordingly, petitioner's request for the appointment of counsel is denied.